## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

JILL CUTTER, a/k/a JILL HARRIS, individually )
and as Personal Representative of the ESTATE OF )
WILLIAM ELMER HARRIS, IV, deceased, and )
WILLIAM ELMER HARRIS, V, minor child of )
William Elmer Harris, IV, through the Guardian and )
Next Friend JILL CUTTER, )
 )
       Plaintiffs, )
 )
v. )    Case No. CIV-06-1158-GKF
 )
THE METRO FUGITIVE SQUAD a/k/a U.S. )
Marshals Metro Fugitive Task Force; JOHN )
WHETSEL, individually and in his official capacity )
as Sheriff of Oklahoma County; LARRY GRANT, )
individually and in his official capacity, as a )
member of the Oklahoma County Sheriff's Office )
and Metro Fugitive Squad; TRESS BOLES, Officer, )
individually and in her official capacity, as a )
member of the Oklahoma County Sheriff's Office )
and Metro Fugitive Squad; CURTIS BACK, )
Officer, individually and in his official capacity, as a )
member of the Oklahoma County Sheriff's Office )
and Metro Fugitive Squad; JIM LILLY, Officer, )
individually and in his official capacity, as a )
member of the Oklahoma County Sheriff's Office )
and Metro Fugitive Squad; BOARD OF COUNTY )
COMMISSIONERS of the County of Oklahoma )
County; UNITED STATES MARSHALS )
SERVICE, an agency of the United States )
Government; MICHAEL ROACH, individually and )
in his official capacity, as United States Marshal, )
Western Judicial District of Oklahoma; DAVE )
KRUG, Officer, individually and acting in official )
capacity as Deputy U.S. Marshal and member of the )
Metro Fugitive Squad; CHUCK McNEIL, Officer, )
individually and acting in official capacity, as )
Deputy U.S. Marshal and a member of the Metro )
Fugitive Squad; ED GRIMES, Officer, individually )
and acting in official capacity as member of the )
Metro Fugitive Squad; JACK DUNCAN, Officer, )
individually and acting in official capacity as )
member of the Metro Fugitive Squad; SCOTT )

CANNON, Officer, individually and acting in          )
official capacity, as member of the Metro Fugitive   )
Squad; ALLIED AMERICAN BAIL BONDS, a                 )
bondsman licensed to do business in Oklahoma         )
County, State of Oklahoma,                           )
                                                     )
            Defendants.                              )

## OPINION AND ORDER

This matter comes before the Court on the Motion to Dismiss filed by Defendants Dave Krug

and Chuck McNeil [Document No. 27], the Motion to Dismiss filed by Defendant Michael Roach

[Document No. 28], the Motion to Dismiss filed by Defendants United States Marshals Service and

the Metro Fugitive Squad [Document No. 29], and the Motion to Dismiss filed by Defendants Tress

Boles, Curtis Back, Jim Lilly, Scott Cannon, John Whetsel, and Larry Grant [Document No. 31].

Plaintiffs originally filed this case in the District Court for Oklahoma County. Defendants

removed the case to federal court and plaintiffs filed an Amended Complaint.

## I. The Allegations of Plaintiffs' Amended Complaint

William Harris, IV ("Harris") and Michael Barnett ("Barnett"), both now deceased, met in

the fall of 2003 while they were incarcerated at the Oklahoma County Jail. (Document No. 19,

Amended Complaint, ¶ 41). Harris was in jail on a forgery charge, while Barnett had five criminal

cases pending against him involving charges of assault with a dangerous weapon, domestic assault

and battery, two counts of possessing a firearm, and multiple counts of drug trafficking. (*Id.*, ¶ 42).

In or around October 2003, Barnett was released from jail on a $150,000 bond. (*Id.*, ¶ 43). Barnett

then paid $650 to bond Harris out of jail. (*Id.*, ¶ 44).

After Barnett failed to appear at three scheduled court dates, Barnett's bond company,

defendant Allied American Bail Bonds ("Allied") asked Harris and his wife, plaintiff Jill Cutter

2

("Cutter"), whether they were aware of Barnett's whereabouts. (*Id.*, ¶¶ 45-46). Cutter provided Barnett's whereabouts to Allied. (*Id.*, ¶ 48). Cutter knew Barnett's whereabouts because he had been contacting her and Harris regarding repayment of the money paid for Harris's bond. (*Id.*, ¶ 47). Allied attempted to capture Barnett utilizing the information provided by Cutter. Unsuccessful in its efforts, Allied then enlisted the assistance of the Metro Fugitive Squad ("MFS"), a joint law enforcement task force comprised of deputies from the Oklahoma County Sheriff's Office, deputies from the U.S. Marshal's Office, and officers from the Oklahoma City Police Department. (*Id.*, ¶ 49-51, 12).

Defendant Larry Grant, a member of the Oklahoma County Sheriff's Office and MFS, pressured Cutter to set up a face-to-face meeting with Barnett so he could be captured. (*Id.*, ¶ 53). Grant promised that MFS would guarantee Cutter's safety. (*Id.*, ¶ 54). Cutter was reluctant to participate because she feared for her family's safety and believed Barnett was becoming suspicious of her and Harris. (*Id.*, ¶¶ 58, 60). Barnett was known to be violent, ruthless and dangerous, and Barnett had threatened Harris and Cutter regarding repayment of the money they owed him. (*Id.*, ¶¶ 3, 47, 64). Nevertheless, Cutter and Harris agreed to cooperate because MFS and Allied threatened to revoke Harris's bond or to bring additional criminal charges against Harris if they refused to participate. (*Id.*, ¶¶ 55, 56). Cutter alleges that she and Harris felt they were not free to decline to assist in the capture of Barnett. (*Id.*, ¶ 57).

On March 10, 2004, Barnett called Harris and Cutter demanding money. (*Id.*, ¶ 62). Cutter contacted Grant on March 11, 2004, and MFS developed a plan for Cutter to set up a face-to-face meeting with Barnett that day. (*Id.*, ¶¶ 62-64). Cutter alleges that she repeatedly expressed her reservations about the prudence of MFS's plan, and that she pleaded with MFS to simply let her

3

obtain information on Barnett's whereabouts so MFS could apprehend Barnett without setting up a face-to-face meeting. (*Id.*, ¶¶ 60, 63). Grant allegedly refused and insisted that she meet with Barnett face-to-face. (*Id.*, ¶ 64).

Cutter agreed to meet Barnett at a 7-11 gas station in Oklahoma City later that day, on March 11. (*Id.*, ¶ 65). Despite the short amount of time within which to formulate a plan, MFS assured Cutter that they had time to properly formulate a plan and that Cutter would be safe. (*Id.*, ¶¶ 66-67). Before the meeting could occur, however, Barnett changed the meeting place and insisted on meeting with Harris instead of Cutter. (*Id.*, ¶ 68). Despite this breakdown in the plans, MFS pressured Harris to meet Barnett and assured Harris that MFS would guarantee his safety. (*Id.*, ¶¶ 69-70). Barnett told Harris to contact him from a pay phone at a Homeland store at Southwest 44th and May Avenue, and Barnett would then identify a meeting place. (*Id.*, ¶ 71). After Harris telephoned Barnett from Homeland and learned of the meeting place, Harris was to immediately call MFS and tell them the location. (*Id.*, ¶ 72). MFS promised to only pursue Barnett from a distance and promised that they would not attempt to apprehend Barnett in Harris's presence. (*Id.*, ¶ 78). MFS also promised not to attempt to capture Barnett if he entered Harris's vehicle or if the vehicle began moving with both men inside. (*Id.*, ¶ 80).

As instructed by Barnett, Harris went to the pay phone at Homeland and called Barnett. Harris did not subsequently call members of MFS to inform them of the meeting location as planned. Plaintiffs allege that Harris did not call the officers because Barnett was in the area watching Harris and monitoring his movements and that defendants' plan failed to account for that possibility. (*Id.*, ¶ 73). Harris then drove a short distance to a location not far from the pay phone and parked his vehicle. Barnett arrived at the location and entered Harris's vehicle. (*Id.*, ¶ 81). Harris began driving away with Barnett inside the vehicle. After the truck had traveled a short distance, numerous

4

MFS officers surrounded the vehicle with their guns drawn. (*Id.*, ¶ 82). Barnett drew his weapon and a "shootout" commenced between Barnett and the officers, and both Barnett and Harris were killed.[1] (*Id.*, ¶ 83-84).

Cutter initiated this action as the surviving spouse of Harris and as personal representative of Harris's estate. Cutter also asserts this action on behalf of, and as guardian of, Harris's minor son, William Elmer Harris, V.   The defendants include Oklahoma County Sheriff John Whetsel ("Whetsel"), in his individual and official capacity; Oklahoma County Sheriff Deputies Larry Grant ("Grant"), Tress Boles ("Boles"), Curtis Back ("Back") and Jim Lilly ("Lilly"), all in their individual and official capacities; U.S. Marshal for the Western Judicial District of Oklahoma, Michael Roach ("Roach"), in his individual and official capacity; U.S. Marshal deputies Chuck McNeil ("McNeil"), Dave Krug ("Krug"), Ed Grimes ("Grimes"), Jack Duncan ("Duncan") and Scott Canon ("Canon"), all in their individual and official capacities; the MFS; the U.S. Marshals Service; the Board of County Commissioners of Oklahoma County; and Allied. The plaintiffs allege that the defendants failed to fulfill their constitutional duties and contractual obligations to protect

---

[1] Defendants sharply contest the plaintiffs' allegations in almost every respect. Most notably, the Oklahoma County Sheriff's Department defendants contend that it was Cutter who initially contacted Grant and told him that she wanted to "set up" Barnett because she and Harris owed him money, which they could not afford to repay. The Sheriff Defendants contend that Cutter made all the plans and pressured Harris to participate. The Sheriff Defendants assert that they were just acting on the information Cutter provided them.  In addition, defendants contend that Harris failed to call MFS with critical information regarding the meeting location. Finally, after Barnett entered Harris's vehicle and Harris drove away, the officers observed Harris maneuvering his truck as if he was attempting to get away. At that point, the officers converged on Harris's truck, exited their vehicles, and began shouting police commands for Harris and Barnett to show their hands. Harris's truck lunged forward, rear tires spinning, and hit an undercover vehicle. Deputy Sheriff Boles attempted to reach into the driver's side window to turn off the engine. Shots were then fired from inside the truck, and the officers returned fire. According to the Sheriff Department defendants, an investigation of the incident revealed that Barnett shot and killed Harris, and the officers reacted and returned fire, killing Barnett. For purposes of the motions to dismiss, the defendants acknowledge that the court must construe the Amended Complaint in the light most favorable to the plaintiffs and must accept as true all well-pleaded factual allegations and reasonable inferences. (Doc. No. 31, p. 5).

Harris, a civilian informant and operative, and to take all reasonable measures necessary to assure his safety both before, during and after the plan was in motion. The plaintiffs bring eight separate causes of action against the defendants arising under 42 U.S.C. § 1983,[2] common law torts, and breach of contract. The claims include (1) 42 U.S.C. § 1983 (special relationship); (2) 42 U.S.C. § 1983 (state created danger); (3) 42 U.S.C. § 1983 (inadequate training and supervision); (4) negligence; (5) emotional distress; (6) punitive damages; (7) private use of public employees; and (8) breach of contract.

Some, but not all, of the defendants have filed motions to dismiss various claims. The motions are brought pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, 12(b)(5) for insufficient service of process, 12(b)(6) for failure to state a claim upon which relief can be granted, and on grounds of qualified immunity.

## II.  Standard

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The United States Supreme Court recently clarified this standard in *Bell Atlantic Corp. v. Twombly*, ruling that to withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face." --- U.S. ----, ----, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Robbins v. Oklahoma*,

---

[2] Section 1983 applies to conduct by state actors. *Anderson v. Suiters*, 499 F.3d 1228, 1232-33 (10th Cir. 2007). To the extent plaintiffs attempt to assert § 1983 claims against federal officials, the claims are more accurately characterized as claims for violations of the United States Constitution under *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

519 F.3d 1242, 1247 (10th Cir. 2008), quoting *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original). "The burden is on the plaintiff to frame a complaint with enough factual matter (taken as true) to suggest that he or she is entitled to relief." *Robbins*, 519 F.3d at 1247, citing *Twombly*, 127 S.Ct. at 1965 (internal quotations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

Although the new *Twombly* standard is "less than pellucid," the Tenth Circuit Court of Appeals has interpreted it as a middle ground between "heightened fact pleading," which is expressly rejected, and complaints that are no more than "labels and conclusions," which courts should not allow. *Robbins*, 519 F.3d at 1247, citing *Twombly*, 127 S.Ct. at 1964, 1965, 1974. Accepting the allegations as true, they must establish that the plaintiff plausibly, and not just speculatively, has a claim for relief. *Robbins*, 519 F.3d at 1247. "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id.* at 1248.

The Tenth Circuit Court of Appeals instructed in *Robbins* that "the degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context. . . .[and] the type of case." *Id.* (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 231-32 (3d Cir. 2008)). A simple negligence action may require significantly less allegations to state a claim under Rule 8 than a case alleging anti-trust violations (as in *Twombly*) or constitutional violations (as in *Robbins*). *Id.*

Like *Robbins*, this case raises constitutional claims and issues of qualified immunity. "Qualified immunity exists to protect public officials from the broad-ranging discovery that can be

7

peculiarly disruptive of effective government." *Id.* at 1248-49 (citing *Anderson v. Creighton*, 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal quotations omitted)). "Defendants are permitted to appeal from the denial of a motion to dismiss on qualified immunity grounds precisely to spare them the ordeal of discovery if the complaint fails to allege a constitutional violation or if the alleged violation was not clearly established." *Id.* at 1249 (citing *Behrens v. Pelletier*, 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)). Thus, in the context of this case, the plaintiffs must allege facts sufficient to show "that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time." *Id.* However, the plaintiffs need not include "all the factual allegations necessary to sustain a conclusion that defendant violated clearly established law." *Id.* (citing *Breidenbach v. Bolish*, 126 F.3d 1288, 1293 (10th Cir. 1997)).

The *Robbins* court further recognized that "Complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants." *Id.* The *Twombly* standard may have "greater bite" in such cases because of the special interest in resolving qualified immunity "at the earliest possible stage of a litigation." *Id.* (citations omitted). The complaint must be sufficiently plausible that it merits imposition of the burdens of discovery on state actors. *Id.*, n. 2.

### III.   Threshold Issues Common to all Motions

With respect to the constitutional claims asserted under 42 U.S.C. § 1983 and *Bivens*, the plaintiffs have sued each individual defendant in his or her personal and official capacity. Personal-capacity suits seek to impose personal liability upon a government official for actions taken under color of law. *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114

(1985) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 237-238, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Id.*, at 165-66 (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.*, at 166 (citing *Brandon v. Holt*, 469 U.S. 464, 471-472, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)); *see also Watson v. City of Kansas City*, 857 F.2d 690, 695 (10th Cir. 1988) ("[A section 1983] suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same"). A plaintiff seeking to recover damages in an official-capacity suit must look to the government entity itself. *Id.*

Here, the plaintiffs have sued the individual defendants, in their personal and official capacities, *and* the corresponding government entity of which the individuals are agents. For example, the plaintiffs have sued Whetsel, Grant, Boles, Back, and Lilly, all in their individual capacities and in their official capacities as agents of the Oklahoma County Sheriff's Office. Plaintiffs also "bring this action against Oklahoma County, a municipality, by naming the Board [of County Commissioners of Oklahoma County], as ultimate supervisors" of the County employees. (Amended Complaint, ¶ 21). In addition, plaintiffs have sued Roach, Krug, McNeil, Grimes, Duncan, and Cannon in their individual capacities and in their official capacities as agents of the U.S. Marshals Service. The plaintiffs also directly sue the U.S. Marshals Service, a federal governmental agency. Finally, the plaintiffs allege that the individual defendants have some involvement with, or acted as agents of, the Metro Fugitive Squad, which is also named as a defendant.

9

The individual defendants who have filed dismissal motions argue that the official capacity claims are actually claims against the government and should be dismissed. The court agrees. Because official capacity suits are simply "another way of pleading an action against an entity of which an officer is an agent," the official capacity claims against the individual defendants are really claims against the government entities. *Monell*, 436 U.S. at 691 n. 55. Here, the official-capacity claims are simply redundant because the plaintiffs have also sued the government entities. Moreover, the Tenth Circuit Court of Appeals has held that a *Bivens* claim lies only against a federal official in his individual capacity and cannot be brought against an individual in his or her official capacity. *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1231 (10th Cir. 2005); *see also Farmer v. Perrill*, 275 F.3d 958, 963 (10th Cir. 2001) ("[t]here is no such animal as a *Bivens* suit against a public tortfeasor in his or her official capacity"). Accordingly, all claims against the moving defendants *in their official capacities* are hereby dismissed.[3] *See also Moore v. Bd. of County Comm'rs of County of Leavenworth*, 470 F.Supp.2d 1237, 1255 (D. Kan. 2007) (dismissing official-capacity claims against individual government actors because the claims are redundant and afford no additional relief where government entity has also been sued).

### IV. Motion to Dismiss filed by Krug and McNeil [Document No. 27]

Defendants Krug and McNeil are Deputy United States Marshals and members of MFS. They admit that they participated in the attempt to arrest Barnett on March 11, 2004. They ask the

---

[3] The Amended Complaint states that the individual defendants are sued in their official capacities "with respect to Plaintiffs' claims under 42 U.S.C. § 1983 and the U.S. Constitution [i.e., *Bivens*]." (Amended Complaint, ¶¶ 15, 17, 20, 28, 30, 33). It appears that the claims arising under tort and contract law are asserted against the individual defendants in their personal capacities only, and not in their official capacities. However, to the extent plaintiffs intend to bring the tort or contract claims against the moving defendants in their official capacities, those claims are likewise dismissed for the reasons stated above.

court to dismiss the claims asserted against them on a number of grounds, which are discussed in turn below.

### A.   Failure of Service

Krug and McNeil were not parties to the original lawsuit filed in the District Court for Oklahoma County. Rather, they were added by way of plaintiffs' Amended Complaint. The Amended Complaint was electronically served upon all counsel of record, including counsel for the U.S. Marshals Service, but it was not served individually upon Krug and McNeil.

Krug and McNeil argue that they have not been effectively served in this action because government officials sued individually for monetary damages must be personally served pursuant to Rule 4(e) of the Federal Rules of Civil Procedure. *See Micklus v. Carlson*, 632 F.2d 227, 240 (3rd Cir. 1980). Failure to personally serve defendants who are sued individually deprives the court of personal jurisdiction. *Id.* The plaintiffs argue that Fed. R. Civ. P. 5 applies, which authorizes service upon counsel, because the pleading at issue is an amended pleading filed subsequent to the original complaint. The plaintiffs assert it was unnecessary to serve Krug and McNeil pursuant to Rule 4.

Where an amended complaint asserts claims against new parties, service under Rule 4 is required on the new parties. *See Ransom v. Brennan*, 437 F.2d 513, 518 (5th Cir. 1971), *cert. denied*, 91 S.Ct. 2205, 403 U.S. 904; *see also Daley v. ALIA*, 105 F.R.D. 87 (E.D.N.Y. 1985) (Plaintiffs are entitled to serve a defendant with an amended pleading by mail, pursuant to Rule 5, only if that defendant was served properly under Rule 4 with the first amended complaint, the first pleading to name the defendant); Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, § 1146 (If a pleading seeks to add a new party, it must be served on the new party together with a summons

11

pursuant to the procedures of Rule 4). For purposes of Rule 4, service of process on an attorney is not effective absent some evidence that the attorney was authorized to accept service on behalf of the party. *See Kelly v. Oakwood Manor Apartments,* 2004 WL 2378838, *2, (D. Kan. Oct. 18, 2004) (citing, among others, *U.S. v. 51 Pieces of Real Property, Rosewell, N.M.,* 17 F.3d 1306, 1313 (10th Cir. 1993)). Plaintiffs offer no showing that counsel of record for the U.S. Marshals' Service was authorized to accept service on behalf of officers Krug and McNeil in their individual capacities.

The court concludes that personal service on Krug and McNeil, consistent with the procedures outlined in Rule 4, is required for the claims asserted against them in their individual capacities. Rule 4(m) allows the court to grant an extension of time to effectuate proper service if the plaintiff shows "good cause" for the failure to timely serve a defendant. *Espinoza v. United States,* 52 F.3d 838, 841 (10th Cir.1995). The plaintiffs have not attempted to show good cause for their failure to serve Krug and McNeil, and even if good cause was shown, allowing additional time for service would be futile. As discussed below, the plaintiffs have failed to assert their *Bivens* claims against Krug and McNeil within the applicable statute of limitations. The plaintiffs have also failed to state claims against Krug and McNeil in their individual capacities arising under common law torts and contract.

### B.  Failure to Serve *Bivens* Claims Within the Limitations Period

The conduct giving rise to this action occurred on March 11, 2004. Civil rights claims filed in Oklahoma, whether pursuant to § 1983 or *Bivens,* are governed by a two-year statute of limitations. *See Meade v. Grubbs,* 841 F.2d 1512, 1522 (10th Cir. 1988) (Oklahoma's two-year statute of limitations for "injury to the rights of another," Okla. Stat. tit. 12, § 95(3), applies to § 1983 claims); *Indus. Constructors Corp. v. U.S. Bureau of Reclamation,* 15 F.3d 963, 968 (10th Cir.

1994) (A *Bivens* action, like a § 1983 action, is subject to the statute of limitations of the general

personal injury statute in the state where the action arose); *Van Tu v. Koster*, 364 F.3d 1196, 1198

(10th Cir. 2004) (*Bivens* claims borrow the statute of limitations for general personal injury claims

in the state where the claim arose).  Krug and McNeil admit that the plaintiffs' original Petition,

filed in state court on March 8, 2006, was timely.  However, Krug and McNeil were not parties to

the original Petition.  Rather, they were added to the lawsuit on April 6, 2007, after the two-year

statute of limitations had expired.  Krug and McNeil therefore argue that the *Bivens* claims against

them are untimely.

Plaintiffs argue that the statute of limitations was tolled because they listed "John Does" in

their original Petition, which were later replaced with Krug and McNeil in the Amended Complaint.

However, "it is familiar law that 'John Doe' pleadings cannot be used to circumvent statutes of

limitations. . . because replacing a 'John Doe' with a named party in effect constitutes a change in

the party sued." *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir. 1993) (citations omitted);

*see also Watson v. Unipress, Inc.*, 733 F.2d 1386, 1389 (10th Cir. 1984).  "Thus, all requirements

of Rule 15(c)(3) must be met in order for [the] amended pleadings to relate back to the date of the

original."[4] *Garrett v. Fleming*, 362 F.3d 692 (10th Cir. 2004) (citing *Alexander v. Beech Aircraft

Corp.*, 952 F.2d 1215, 1226-27 (10th Cir. 1991)).

Rule 15(c)(1) provides:

> An amendment to a pleading relates back to the date of the original
> pleading when:
> > (A) the law that provides the applicable statute of limitations
> > allows relation back;

---

[4] Rule 15 (c)(3), which is referenced in the 2004 *Garrett* decision, is virtually identical to current
Rule 15(c)(1)(C).  Rule 15 was amended in 2007, but the amendments are intended to be stylistic only.

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1).

Subsection (c)(1)(C) of Rule 15 applies here because the amended pleading changes the party or the naming of the party to be sued. In that regard, there is no question that the Amended Complaint asserts claims against Krug and McNeil which arise out of the same conduct as that set out in the original Petition. The more critical question is whether Krug and McNeil, (i) received notice of the action so that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against them, but for a mistake concerning the proper party's identity. Fed. R. Civ. P. 15(c)(1)(C).

The plaintiffs argue that "all the Deputy Marshals who are defendants in this case, knew that the U.S. Marshal Roach is a named party in this lawsuit, and that *but for the mistake of not knowing the individual identifies of the deputies involved* in Metro Fugitive Squad in the events of March 8 [sic], 2004, Defendants [Krug and McNeil] would have been named in the lawsuit." (Doc. No. 33, p. 4, emphasis added). However, the Tenth Circuit Court of Appeals has held that "a plaintiff's lack of knowledge of the intended defendant's identity is not a 'mistake concerning the identify of the

14

proper party' within the meaning of Rule 15(c)(3)(B)." *Garrett*, 362 F.3d at 696.[5] The *Garrett* court concluded that this interpretation of Rule 15 is consistent with prevailing law among other circuits and with the Advisory Committee Notes to Rule 15(c), which indicate that the "the mistake proviso [was included] . . . in order to resolve 'the problem of a misnamed defendant' and allow a party 'to correct a formal defect such as a misnomer or misidentification.'" *Id.* at 696-97 (citing *Wayne v. Jarvis*, 197 F.3d 1098, 1103-04 (11th Cir. 1999) (quoting Advisory Committee Notes to 1991 Amendment of Rule 15(c)). The rule is meant to allow an amendment changing the name of a defendant to relate back only if the change is a result of such a formal defect. *Id.* at 697 (citations and quotations omitted). "A plaintiff's designation of an unknown defendant as 'John Doe' in the original complaint is not a formal defect of the type Rule (c)(3) was meant to address." *Id*; *see also Porro v. Jefferson County, Okla.*, 2007 WL 1674156, *1 (W.D. Okla., June 7, 2007) (finding no relation back under Rule 15(c), based on *Garrett*, and dismissing John Doe defendant who was added after the statute of limitations expired).[6]

The court concludes that the amendment changing "John Does" to Krug and McNeil does not relate back to the date of the original Petition pursuant to Rule (c)(1)(C). As such, the *Bivens* claims against Krug and McNeil were not asserted within the applicable statute of limitations and are dismissed with prejudice. Because the *Bivens* claims against Krug and McNeil are dismissed as untimely, Krug and McNeil's arguments regarding qualified immunity are moot.

---

[5] Again, *Garrett* references former Rule 15, which was structurally – but not substantively – different than the current Rule.

[6] Although not raised by the parties, it is worth noting that Rule 15 (c)(2) provides a limited exception to the requirements of Rule (c)(1)(C)(i) and (ii) in cases against United States officers. While this provision may be applicable to the claims asserted against Krug and McNeil in their official capacities as U.S. Marshal Deputies, such claims have been dismissed.

## C.  Common Law Tort Claims

Krug and McNeil ask the court to dismiss the common law tort claims asserted against them in their individual capacities.  Krug and McNeil argue that they are immune from common law tort claims because they were acting within the scope of their duties as U.S. Marshal deputies.  Krug and McNeil rely upon the Federal Employees Liability Reform and Tort Compensation Act (the "Liability Reform Act"), 28 U.S.C.A. § 2679(b)(1), which creates absolute tort immunity for federal employees sued in their individual capacities. *United States v. Smith*, 499 U.S. 160, 162-63, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991).  The Liability Reform Act was enacted in 1988 as an amendment to the Federal Torts Claim Act ("FTCA") in response to the United States Supreme Court ruling in *Westfall v. Erwin*, 464 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988), which held that the judicially created doctrine of official immunity does not provide absolute immunity to government employees for torts committed in the scope of their employment. *Smith,* 499 U.S. at 163. The Liability Reform Act establishes absolute immunity for government employees by making an action against the government under the FTCA the exclusive remedy for torts committed by government employees in the scope of their employment.  *Id.*[7]

On May 1, 2007, the United States certified and filed notice that Krug and McNeil were acting in the scope of their employment on the dates alleged in the Amended Complaint.  Federal law provides that "[u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim

---

[7] 28 U.S.C.A. § 2679(b)(1) provides in part that the remedy provided against the United States by the FTCA "for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive. . . .  Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded. . . ."

arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States. . . ." 28 U.S.C.A. § 2679(d)(1). Notably, even the plaintiffs allege that Krug and McNeil were acting within the scope of their employment. (Amended Complaint, ¶¶ 34-35). The plaintiffs do not dispute that the Liability Reform Act applies here or that Krug and McNeil are immune from the common law tort claims asserted against them. Accordingly, the common law tort claims asserted against Krug and McNeil in their individual capacities are dismissed. Such claims are properly asserted against the United States government.

D.  Contract Claims

Lastly, Krug and McNeil argue that the contract claims asserted against them should be dismissed because any promise or agreement to ensure the safety of Harris would be made in their official capacities. Therefore, a contract action may only be asserted against the United States, not Krug or McNeil individually. In this regard, Krug and McNeil assert that Congress has waived the federal government's sovereign immunity for suits based upon contract in the Contract Disputes Act, 41 U.S.C. §§ 601-613 and the Tucker Act, 28 U.S.C. § 1346(a). The plaintiffs do not dispute Krug and McNeil's arguments. In fact, the plaintiffs do not raise any objection to the dismissal of their contract claims against Krug and McNeil in their individual capacities.

The contract claims, insofar as they are asserted against Krug and McNeil in their individual capacities, are dismissed.

**V.  Motion to Dismiss filed by Roach [Document No. 28]**

Defendant Roach, U.S. Marshal for the Western District of Oklahoma, seeks dismissal of the claims asserted against him. Plaintiffs do not allege that Roach was personally involved in the events underlying this action. Rather, Roach's inclusion in the lawsuit relates to his role as a

17

supervisor.  Plaintiffs allege that the "Defendants" (which seemingly includes Roach) failed to adequately train and supervise their officers and failed to adopt or implement a policy to prevent such incidents as occurred in this case.  As the official capacity claims against Roach have been dismissed by the court and voluntarily by the plaintiffs themselves,[8] the court will consider Roach's arguments as they relate to the claims asserted against him in his individual capacity.

### A.  Common Law Tort Claims

Roach first argues that he is immune from common law tort claims asserted against him in his individual capacity because all alleged acts occurred while he was acting within the scope of his duties as United States Marshal.  Roach relies upon the Liability Reform Act, 28 U.S.C.A. § 2679(b)(1), which, as discussed above, creates absolute tort immunity for federal employees.  As mentioned, the Liability Reform Act makes an action against the government under the FTCA the exclusive remedy for torts committed by government employees in the scope of their employment. *Smith*, 499 U.S. at 162-163.

On October 19, 2006, the United States certified and filed notice that Roach was acting in the scope of his employment on the dates alleged in the original Petition.  As noted above, 28 U.S.C.A. § 2679(d)(1) provides that upon such certification, the action shall be deemed one against the United States.  The plaintiffs do not dispute that Roach was acting within the scope of his employment (Amended Complaint, ¶¶ 34-35), and do not dispute that the Liability Reform Act grants Roach immunity from the common law tort claims.  The court concludes that the common law tort claims asserted against Roach in his individual capacity should be and are hereby dismissed.

---

[8] In response to Roach's motion to dismiss, the plaintiffs voluntarily dismissed all claims asserted against Roach in his official capacity.  (Doc. No. 34, p. 2).

### B.  Contract Claims

Roach also argues that the contract claims asserted against him in his individual capacity should be dismissed because any promise or agreement to ensure the safety of Harris would be made in Roach's official capacity.  Therefore, a contract action may only be asserted against the United States, not Roach individually.  In this regard, Roach asserts that Congress has waived the federal government's sovereign immunity for suits based upon contract in the Contract Disputes Act, 41 U.S.C. §§ 601-613 and the Tucker Act, 28 U.S.C. § 1346(a).  The plaintiffs do not dispute Roach's arguments.  In fact, the plaintiffs do not raise any objection to the dismissal of their contract claims against Roach.  The contract claims asserted against Roach in his individual capacity are dismissed.

### C.  Constitutional Claims

Count III of the plaintiffs' Amended Complaint alleges a violation of Harris's constitutional rights under 42 U.S.C. § 1983 for inadequate training and supervision.  It appears that plaintiffs have asserted Count III against all defendants named in the case – regardless of whether the named defendant is responsible for supervision or training – yet damages for Count III are sought only against Oklahoma County, the United States Marshals Service, and the MFS, jointly and severally.  Nevertheless, the substance of the plaintiffs' allegations regarding deficiencies and failures in the defendants' supervision and training are that:

> Defendants had a continuing, persistent, well-settled, and widespread historical custom and policy of providing deficient training, supervision, and discipline. . . relating to. . . the circumstances under which a civilian may and may not serve as a police informant or 'operative'; the protection of the confidentiality before and during an operation; the protection of an informant before, during, and after an operation; and the planning and execution of operations involving civilian informants or operatives.
>
> Defendants were on notice of such deficiencies in training,

19

supervision, and discipline and the resulting likelihood of deprivations of citizens' constitutional rights. . . .

The failure of Defendants 'policy makers' to adopt and implement improved training, supervision, and discipline constituted deliberate indifference to, and/or tacit approval of, the misconduct of its law enforcement officers rendered future misconduct by their law enforcement officers virtually inevitable, and was the primary force behind the deprivations of William[ Harris]'s constitutional rights and his ultimate death.

(Amended Complaint, ¶¶ 117, 118, and 120).

Supervisors may be held individually liable for failure to train or failure to adopt or implement a policy to prevent deprivations of constitutional rights. *See Sutton v. Utah State School for the Deaf and Blind*, 173 F.3d 1226, 1238-39 (10th Cir. 1999). However, supervisory liability cannot be predicated upon mere negligence. *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992). Moreover, there must be "an affirmative link. . . between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Meade*, 841 F.2d at 1527-28 (10th Cir. 1988) (citations and internal quotations omitted). A superior must have "participated or acquiesced in the constitutional deprivations of which complaint is made." *Id.* at 1528 (quoting *Kite v. Kelley*, 546 F.2d 334, 337 (10th Cir. 1976)). To be liable for failure to train, there must be a "complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Id.* (citing *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 873-74 (6th Cir. 1982), *cert. denied*, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982)). A plaintiff must show that a supervisor has either established or utilized an unconstitutional policy or custom, or breached a duty imposed by state or local law which caused the constitutional violation. *Id.* (citing *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir.1986) (per curiam)).

20

As discussed above, in ruling on a motion to dismiss for failure to state a claim, the court assumes the truth of the plaintiffs' well-pleaded factual allegations and views them in the light most favorable to the plaintiff. *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). However, to "nudge their claims across the line from conceivable to plausible," in the context of this case, the plaintiffs "must allege facts sufficient to show. . . that the defendants plausibly violated [Harris's] constitutional rights, and that those rights were clearly established at the time." *Robbins*, 519 F.3d at 1249. "Plausible" does not mean "likely to be true," but rather, refers to the scope of the allegations in a complaint: "if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Id.* at 1247 (citing *Twombly*, 127 S.Ct. at 1974). The allegations must be enough that the plaintiff plausibly – and not just speculatively – has a claim for relief. *Id.*

It is typical in § 1983 cases for the plaintiff to include a number of government actors and government entities as defendants. *Id.* at 1249-1250. "Therefore it is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Id.* at 1250 (emphasis in original)(citing *Twombly*, 127 S.Ct. at 1970-71 n. 10). The Tenth Circuit Court of Appeals determined that the complaint in *Robbins* failed to provide adequate notice as to the nature of the claims against each defendant because it failed to isolate the allegedly unconstitutional acts of each defendant. *Id.*

Here, the plaintiffs do not allege that Roach, specifically, had any involvement in the attempted apprehension of Barnett; that he was responsible for supervision or training of other

21

defendants who were involved in the attempted apprehension of Barnett; that he established or utilized an unconstitutional policy or custom, or breached a duty imposed by state or local law; or that Roach himself committed any act or failed to commit any act regarding his role as supervisor or trainer of any other defendant. Moreover, the plaintiffs' allegations regarding the alleged supervisory failures are conclusory – alleging generally that the defendants' training and policies regarding the use of civilian operatives are deficient. These broad statements are not supported by any facts. As such, the plaintiffs have failed to allege any "affirmative link" between any alleged constitutional deprivations and Roach's personal participation, his exercise of control or direction, or his failure to supervise. *Meade*, 841 F.2d at 1527-28. The plaintiffs must allege facts which support the conclusion that Roach "participated or acquiesced in the constitutional deprivations of which complaint is made." *Id.*

The plaintiffs bear the burden to frame a complaint with enough factual matter to suggest that they are entitled to relief, and the right to relief must raise above the speculative level. *Robbins*, 519 F.3d at 1247. The plaintiffs have failed to meet this burden as to their constitutional claims against Roach. Therefore, Roach's motion to dismiss the constitutional claims asserted against him is granted.

### VI. Motion to Dismiss filed by the Metro Fugitive Squad [part of Document No. 29]

MFS argues that because it is a joint federal-state-local task force, it is not an entity that can be sued. The plaintiffs contend that whether or not MFS is subject to suit depends on whether it has promulgated its own policies, rules and regulations for its members, and whether the parties that created MFS intended to create a legal entity. The plaintiffs assert that because discovery has not been conducted in this case, the formalities of MFS are unknown and MFS should not be dismissed.

22

Local governmental bodies are subject to suit under 42 U.S.C. § 1983, but cannot be held liable "simply because they employed the tortfeasor acting within the scope of his or her employment." *Monell*, 436 U.S. at 694; *see also Wilson v. Meeks,* 98 F.3d 1247, 1254-55 (10th Cir. 1996). Rather, a municipality can only be liable under § 1983 if it took "action pursuant to official municipal policy of some nature [that] caused a constitutional tort." *Beedle v. Wilson*, 422 F.3d 1059, 1067 (10th Cir. 2005) (citing *Monell*, 436 U.S. at 691). Further, an intergovernmental task force made up of various local, county and state agencies may be subject to suit under § 1983 if the parties that created it intended to create a separate legal entity. *Hervey v. Estes*, 65 F.3d 784, 792 (9th Cir. 1995).

It is premature to determine at this stage of the proceedings whether MFS is subject to suit under § 1983. There is no record evidence regarding the creation of MFS, whether the creators of MFS intended to establish a separate legal entity subject to suit, whether there is a joint operating agreement among the government entities, whether MFS has an independent operating budget, whether its member entities retain responsibility for the employment, salary, benefits, and terms and conditions of all employees, whether MFS is vested with policymaking authority or has promulgated any rules or regulations for the law enforcement activities of its members, or whether the MFS participants remain obliged to follow the rules and regulations of his or her respective law enforcement agency. *See Hervey*, 65 F.3d at 792; *Eversole v. Steele*, 59 F.3d 710, 716 n. 6 (7th Cir. 1995). Thus, MFS's motion to dismiss on the basis that it is not an entity subject to suit under § 1983 is denied without prejudice to reassertion in a motion for summary judgment.

### VII.   Motion to Dismiss filed by the United States Marshal Service [part of Document No. 29]

The U.S. Marshals Service also argues that it is not subject to suit. The Marshals Service

23

cites *Blackmar v. Guerre*, 342 U.S. 512, 514-15 (1951) for the proposition that federal agencies cannot be sued for damages *eo nomine* unless Congress has explicitly or implicitly denominated the agency as amenable to such suit. This, however, constitutes the entirety of the U.S. Marshals Service's argument. Counsel has not provided any argument or authorities as to whether Congress has "explicitly or implicitly denominated the agency as amenable to suit" with respect to each of the claims asserted in this action. The plaintiffs' counsel likewise provides no argument or authorities in this regard.

Absent a waiver, sovereign immunity shields the federal government and its agencies from suit. *See Nat'l Commodity & Barter Ass'n, Nat'l Commodity Exch. v. Gibbs*, 886 F.2d 1240, 1245-46 (10th Cir. 1989); *Loeffler v. Frank*, 486 U.S. 549, 554, 108 S.Ct. 1965, 1968, 100 L.Ed.2d 549 (1988). Sovereign immunity is jurisdictional in nature. Indeed, the "terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941); *see also United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction"). Therefore, it is important to determine whether the U.S. Marshals Service's immunity has been waived with regard to each of the claims asserted against it.

A. Common Law Tort Claims

The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, provides a limited waiver of sovereign immunity for tort claims against the United States. *See, e.g., Bradley v. U.S.*, 951 F.2d 268, 270 (10th Cir.1991); *Three-M Enter., Inc. v. U.S.*, 548 F.2d 293, 294 (10th Cir. 1977). The FTCA is the "exclusive" remedy for all "claims which are cognizable under section 1346(b)" of the

24

Act. *See* 28 U.S.C. § 2679(a). Section 1346(b) grants federal district courts jurisdiction over claims that are "against the United States, for money damages, ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The tort claims asserted in this case come within the purview of the FTCA.

However, claims brought under the FTCA must adhere to specific procedural requirements. The notice requirements, in particular, must be strictly construed in light of the waiver of sovereign immunity provided by the FTCA. *See Cizek v. United States*, 953 F.2d 1232, 1233 (10th Cir. 1992) (citing *Three-M*, 548 F.2d at 295); *see also Bradley*, 951 F.2d at 270. Section 2675(a) of the FTCA requires a claimant to present his claim to the appropriate federal agency before bringing suit against the United States.[9] *See Cizek*, 953 F.2d at 1233. The Tenth Circuit has stated that in order to comply with Section 2675(a), claimants must file an administrative claim which contains "(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim." *Id.* The requirements are jurisdictional and cannot be waived. *Id.* The plaintiffs here have not alleged or otherwise shown that they filed an administrative claim. Thus, to the extent they bring suit under the FTCA, this Court lacks jurisdiction and the tort claims asserted against the U.S. Marshals Service are dismissed. *See McNeil v. United States*, 508 U.S.

---

[9] 28 U.S.C. § 2675(A) provides in relevant part: "An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail."

106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("the FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies").

## B. *Bivens* Claims

The Supreme Court has held that a *Bivens* cause of action may be brought against individual federal officials but cannot be brought against a federal agency. *Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 484-86, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)*; see also Correctional Services Corp. v. Malesko*, 534 U.S. 61, 69, 122 S.Ct. 515, 520-21 (2001). "[T]he purpose of *Bivens* is to deter the *officer*," not the agency. *Id.*, at 485 (emphasis in original) (citing *Carlson v. Green*, 446 U.S. 14, 21, 100 S.Ct. 1468, 1472, 64 L.Ed.2d 15 (1980)); *see also Kroekel v. U.S. Marshals Service*, 1999 WL 33919792, *9 (D.Colo., May 21, 1999) ("absent a waiver of sovereign immunity, the *Bivens* remedy exists solely against individual federal officials, not against the United States or its agencies") (citing *Kreines v. United States*, 33 F.3d 1105, 1109 (9th Cir. 1994)).  Accordingly, the *Bivens* claims against the U.S. Marshals Service are dismissed.

## C. Contract Claims

The Tucker Act provides in pertinent part that a district court has original jurisdiction concurrent with the United States Court of Federal Claims over any claim "against the United States not exceeding $10,000 in amount, founded . . . upon any express or implied contract, not sounding in tort...." 28 U.S.C. § 1346(a)(2).  The Court of Federal Claims has exclusive jurisdiction over such claims exceeding $10,000. 28 U.S.C.A. § 1491; *see also Burkins v. United States*, 112 F.3d 444, 449 (10th Cir. 1997).  While the allegations underlying the plaintiffs' breach of contract claim are not entirely discernable, there is no question that plaintiffs "seek compensatory damages. . . due to the breach of the agreement. . . in an amount not less than $10,000." (Amended Complaint, ¶ 169).

26

Thus, to the extent plaintiffs intend to assert a breach of contract claim against the U.S. Marshals Service, this court lacks jurisdiction of such claims and they are dismissed.

### VIII.   Motion to Dismiss filed by Boles, Back, Lilly, Cannon, Whetsel, and Grant [Document No. 31]

Oklahoma County Sheriff Whetsel, and Sheriff Deputies Grant, Boles, Back, Lilly, and Cannon (collectively referred to as the "Sheriff Defendants") argue that they are entitled to qualified immunity with respect to the § 1983 claims asserted against them.   Qualified immunity protects government officials from individual liability in a § 1983 action unless the official's conduct violates clearly established constitutional rights. *See Perez v. Unified Gov't of Wyandotte County,* 432 F.3d 1163,1165 (10th Cir. 2005); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).   Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).   As a result, the Supreme Court has stressed that it is critical to resolve immunity questions at the earliest possible stage in the litigation. *See Saucier v. Katz,* 533 U.S. 194, 199-201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

When a defendant raises a qualified immunity defense, the plaintiff bears the burden of establishing (i) that the defendant's actions violated a constitutional or statutory right; and (ii) the constitutional or statutory right was clearly established at the time of the conduct at issue. *Perez,* 432 F.3d at 1165; *Albright v. Rodriguez,* 51 F.3d 1531, 1534 (10th Cir. 1995).   "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. 194 at 202.   The doctrine ensures that government actors have notice of the constitutional

27

restrictions on their behavior. *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

The plaintiffs allege that the defendants violated Harris's constitutional rights by exposing him to serious risk and harm and by failing to protect him from Barnett. Generally, a state does not have a constitutional duty to protect the life, liberty, and property of its citizens against invasion by private actors. *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 195-97, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). However, there are two established exceptions to this rule: (1) the "special relationship" doctrine; and (2) the "danger creation" theory. *Ulhrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995). The plaintiffs argue that both exceptions to *DeShaney* apply here.

## A.  Special Relationship Doctrine

A "special relationship" exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual. *DeShaney*, 489 U.S. at 199-200. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 200. The "affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id. DeShaney* demonstrates that the "special relationship" doctrine generally applies to the right of an involuntarily confined individual such as a prisoner or involuntarily confined mental patient to obtain care and services necessary for his or her safety and health – e.g. food, clothing, shelter, medical care, and reasonable safety. *Id.* The Tenth Circuit Court of Appeals has held that "a plaintiff must show involuntary restraint by the government official in order to establish a duty to protect under the

special relationship theory." *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1261 (10th Cir. 1998) (citing *Liebson v. New Mexico Corrections Dep't*, 73 F.3d 274, 276 (10th Cir. 1996)).

The court concludes that the "special relationship" doctrine does not provide an exception to *DeShaney* in this case. Harris was not in the State's custody, nor was Harris involuntarily restrained by the State. Moreover, Harris voluntarily agreed to participate in the attempt to apprehend Barnett. While the plaintiffs allege that Harris was threatened with the revocation of his bond and/or criminal charges if he did not agree to act as "human bait," Harris was free to decline any involvement in apprehending Barnett. He was neither incarcerated nor institutionalized nor subject to a similar restraint on his personal liberty as defined in the caselaw presented to this court. *Armijo*, 159 F.3d at 1261. Harris has presented no authority in support of his position that he was in "constructive custody" because he felt he was not free to reject participating as a civil operative, or whether "constructive custody," if established, is sufficient to invoke the special relationship doctrine.

Although the allegations of the Amended Complaint do not state a plausible basis for the special relationship exception to *DeShaney*, they support a plausible basis for the danger-creation exception, discussed below. Plaintiffs' Count I, a separately-stated claim based upon an alleged special relationship, is dismissed.

### B.  State-Created Danger

The "danger creation" doctrine provides that state officials may be liable for injuries caused by a private actor when those officials created the danger or made the victim more vulnerable to the danger that led to the harm. *Armijo,* 159 F.3d at 1262; *Ulhrig*, 64 F.3d at 572; *Sutton*, 173 F.3d at 1238 (10th Cir. 1999). To establish the "danger creation" exception to *DeShaney*, a plaintiff must

29

demonstrate that (1) plaintiff was a member of a limited and specifically definable group; (2) defendants' conduct put plaintiff at substantial risk of serious, immediate and proximate harm; (3) the risk was obvious or known; (4) defendants acted recklessly in conscious disregard of that risk; (5) such conduct, when viewed in total, is conscience shocking; and (6) the state actors created the danger or increased plaintiff's vulnerability to the danger in some way. *Armijo*, 159 F.3d at 1262-63 (citing *Ulhrig*, 64 F.3d at 574 (quotations omitted); *DeShaney*, 489 U.S. at 201).

The plaintiffs' Amended Complaint contains a host of allegations, which (although strongly disputed) provide a plausible basis for the "danger creation" exception. While the allegations are often confusing and imprecise, the court has construed the allegations in the light most favorable to the plaintiffs. Taking the allegations as true, the Sheriff Defendants: (i) knew that Barnett was violent, ruthless and dangerous, and would likely be armed; (ii) pressured Harris to participate in the apprehension of Barnett by threatening to revoke Harris's bond or to press further criminal charges against Harris; (iii) insisted that Harris meet with Barnett face-to-face; (iv) undertook responsibility for Harris's safety by planning, facilitating and monitoring the attempted apprehension of Barnett; (v) made various promises to Harris ensuring his safety, such as promising to capture Barnett before he approached Harris's vehicle and promising to not apprehend Barnett if he entered Harris's vehicle or was in Harris's presence; (vi) failed to provide Harris with body armor, electronic monitoring, or advice on how to protect himself; (vii) failed to provide contingency plans if the operation did not go as planned; (viii) allowed Barnett to enter Harris's car; (ix) pursued the vehicle and surrounded it in "swat-team style" with guns drawn, causing Barnett to panic; and (iix) failed to take other less-dangerous opportunities to arrest Barnett.

The Sheriff Defendants, as mentioned, contend that Cutter came to them with the plan to

30

apprehend Barnett, and that Cutter (not the defendants) pressured Harris to participate in the plan. Thus, the Sheriff Defendants assert that they did not affirmatively place Cutter or Harris in any danger. The Sheriff Defendants also contend that Harris failed to comply with the stated plans, thereby placing himself in danger. The court cannot resolve these disputed issues of fact on a motion to dismiss.

Accepting the plaintiffs' version of the facts as true, and accepting that the defendants initiated, planned and facilitated the attempted apprehension of Barnett in the manner pled by the plaintiffs, such conduct could plausibly be sufficient to establish that the Sheriff Defendants engaged in affirmative conduct that put Harris at substantial risk of serious, immediate and obvious harm. The plaintiffs' allegations, if true, raise a plausible claim that the Sheriff Defendants increased the risk of harm to Harris by allowing Barnett to enter Harris's vehicle, and by converging on Harris's vehicle and surrounding it "swat team" style with guns drawn, allegedly causing a gunfight with Barnett while he and Harris were in the same vehicle. However, the law of this Circuit requires the plaintiffs to establish that the Sheriff Defendants acted recklessly in conscious disregard of the known risks and that their conduct, when viewed in total, is conscience-shocking.

Only government conduct that "shocks the conscience" can give rise to a substantive due process claim. *Perez*, 432 F.3d at 1166 (citations omitted). "[T]he danger creation theory must ultimately rest on the specifics of a substantive due process claim-i.e. a claim predicated on reckless or intentional injury-causing state action which 'shocks the conscience.'" *Uhlrig*, 64 F.3d at 572. An "act is reckless when it reflects a wanton or obdurate disregard or complete indifference to risk," and reckless intent is established if the state "actor was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in

31

conscious and unreasonable disregard of the consequences." *Sutton,* 173 F.3d at 1238 (quoting *Medina v. City and County of Denver,* 960 F.2d 1493, 1496 (10th Cir. 1992)). Recklessness excludes conduct which is merely negligent. *Id.* (citing *Uhlrig,* 64 F.3d at 573). Indeed, liability under the Due Process Clause may not be based on negligent action. *Id.*; *Lewis,* 118 S.Ct. at 1718 ("liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process"). To satisfy the "shock the conscience" standard, "the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Uhlrig,* 64 F.3d at 574.

The level of culpability that must be shown under the "shocks the conscience" standard is difficult to define. *Radecki v. Barela,* 146 F.3d 1227, 1229 (10th Cir. 1998). Conscience-shocking behavior is most likely to be found where there is an intent to do harm that is not justified by any government interest. *Id.* at 1231 (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 853, 118 S.Ct. 1708, 1718, 140 L.Ed.2d 1043 (1998)). "[I]n the middle range of the culpability spectrum, where the conduct is more than negligent but less than intentional, there may be some conduct that is egregious enough to state a substantive due process claim." *Id.* (citing *Lewis,* 118 S.Ct. at 1718-19). Within this middle range, courts must analyze the level of culpability "by examining the circumstances that surround the conduct at issue and the governmental interest at stake." *Id.*

The key inquiry is whether the official had the opportunity for deliberation. *Id.* Courts must distinguish between emergency action and action taken after opportunity for reflection. *Id.* Great deference must be given to decisions that necessarily occur in emergency situations. *Id.* at 1231-32. Thus, in emergency situations, only conduct by which the official intended to cause harm and in which the state lacks any justifiable interest will shock the conscience and result in constitutional

32

liability. *Id.* at 1232. "The intent to harm standard is not limited to situations calling for split-second reactions. Rather, it applies whenever decisions must be made 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Perez*, 432 F.3d at 1166 (citing *Lewis*, at 853, 118 S.Ct. 1708).

On the other hand, "where the state actor has the luxury to truly deliberate, something less than unjustifiable intent to harm, such as calculated indifference, may suffice to shock the conscience." *Radecki,* 146 F.3d at 1232. Courts should employ the "deliberate indifference" standard only when actual deliberation is practical. *Id.*; *see also Perez*, 432 F.3d at 1166 (Courts should look to whether the defendant faced a situation "calling for fast action," in which only conduct done with an intent to harm violates the Fourteenth Amendment, or whether the defendant faced a situation in which there was enough time to engage in "actual deliberation," where conduct showing "deliberate indifference" to a person's life or security will shock the conscience and violate the Fourteenth Amendment).

Finally, in discerning whether the facts of a particular case "shock the conscience" so as to support a substantive due process claim, the Tenth Circuit Court of Appeals has repeatedly emphasized that courts must be mindful of three basic principles highlighted by the Supreme Court:

> (1) the need for restraint in defining [the] scope [of substantive due process claims]; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety.

*Armigo*, 159 F.3d at 1262 (citing *Uhlrig*, 64 F.3d at 573); *see also Radecki*, 146 F.3d at 1229-30.

Here, the defendants' conduct must be analyzed with respect to the particular circumstances the officers faced at the time. Based on the authorities discussed above, it is inappropriate for the court to apply a blanket "shock the conscience" standard to all of the defendants' conduct because

some of the circumstances allowed for actual deliberation or reflection, while other circumstances required instant reactions. The conduct of the defendants, which allegedly placed Harris in danger, can be broken down into three general categories: (1) the defendants' decision to engage Harris as a civilian operative and the actual planning of the operation itself; (2) the defendants' decision to converge on Harris's vehicle "swat-team" style soon after Barnett got inside and Harris drove away; and (3) the defendants' decision to engage in gunfire with Barnett in Harris's presence.

The court concludes that the first category of conduct – *i.e.*, the defendants' decision to engage Harris, a civilian, in an operation to apprehend Barnett and the plans underlying the operation – involved actual deliberation. Taking the plaintiffs' allegations as true, the Sheriff Defendants' conduct in this regard could rise to the level of deliberate indifference. The plaintiffs assert that the defendants knew Barnett was ruthless, violent and dangerous but still insisted on a face-to-face meeting, which involved substantial risk to Harris. According to the plaintiffs, the defendants' plan was recklessly deficient in that it failed to account for the likely scenario that Harris would be unable to call the officers before coming into contact with Barnett. Plaintiffs also allege that the operation was unnecessarily rushed and the officers failed to provide any equipment, training or advice to Harris regarding his role as a civilian operative. Where the defendants had the opportunity to truly deliberate, as they did here, deliberate indifference may suffice to shock the conscience.

On a motion to dismiss, the court merely addresses the legal sufficiency of the allegations. The court concludes that the plaintiffs' factual allegations support a plausible basis for an exception to *DeShaney* and may give rise to a constitutional violation. As demonstrated by the substantial caselaw cited herein, such a constitutional violation would be well-established in the law. The court

34

denies the motion to dismiss on the grounds of qualified immunity with regard to the deliberate acts in planning the operation. This issue is better suited for a motion for summary judgment, in which the court may consider extrinsic evidence.

      With respect to the second category of conduct – *i.e.*, converging on Harris's vehicle "swat-team" style with guns drawn after the vehicle had traveled a short distance – the court concludes that this conduct also involved time for actual deliberation and should be analyzed under the deliberate indifference standard. The plaintiffs assert that the defendants promised they would not apprehend Barnett in Harris's presence, and, in particular, that they would not apprehend Barnett if he entered Harris's vehicle or if the vehicle began moving with both men inside. Taking the allegations as true, the defendants' decision to converge on the vehicle shortly after it started traveling could rise to the level of deliberate indifference to Harris's life or security. The defendants' conduct was arguably contrary to the very plans they allegedly established. Moreover, the plaintiffs allege that the defendants were not faced with unforseen or unexpected circumstances because, according to the plaintiffs, they had already planned for this turn of events. Prior to the operation, the defendants considered the possibility that Barnett might enter Harris's vehicle, and if he did, they would not attempt to apprehend him. Had they remained faithful to the alleged plan, the undercover officers may have been able to follow Harris's vehicle until they were presented with less dangerous opportunities to apprehend Barnett. Accepting the plaintiffs' allegations as true, as this court must, the defendants' conduct in surrounding the vehicle "swat-team" style with guns drawn while Harris was inside and contrary to the established plan could rise to the level of deliberate indifference.

      Finally, the deliberative judgments in planning the operation and surrounding Harris's vehicle are distinguishable from the decisions the defendants had to make at the time they were

35

faced with emergency circumstances.  In considering the actions of the Sheriff Defendants after they

converged on the vehicle, the court must apply the "intent to harm" standard.  After the defendants'

surrounded the vehicle, Barnett "panicked" and drew his weapon.  At this point, the defendants were

faced with circumstances requiring instant action.  The officers fired their weapons.  The plaintiffs

claim that there is a material dispute as to whether the officers' shots or Barnetts' shots killed Harris,

which may be resolved through discovery, if relevant.  As noted above, however, great deference

must be given to decisions that necessarily occur in emergency situations.  The defendants' decisions

to engage in gunfire must be unjustifiable and intentional injury-causing state action to rise to the

level of shocking the conscience.  Here, the plaintiffs have made no allegation that the Sheriff

Defendants acted with an intent to harm Harris.  Indeed, the plaintiffs allege that the "shootout" was

between the officers and Barnett, not Harris.   (Amended Complaint, ¶ 7).   Under these

circumstances, even precipitate recklessness fails to inch close enough to shock the conscience, and

there is no constitutional liability.  *Lewis*, 118 S.Ct. at 1720.

To the extent the plaintiffs' state-created danger claim is based on the defendants' decision

to engage in gunfire with Barnett, such claims must be dismissed as to the Sheriff Defendants.[10]

**WHEREFORE**, the Motion to Dismiss filed by Defendants Dave Krug and Chuck McNeil

[Document No. 27] is **granted**, the Motion to Dismiss filed by Defendant Michael Roach

[Document No. 28] is **granted,** the Motion to Dismiss filed by Defendants United States Marshal

Service and the Metro Fugitive Squad [Document No. 29] is **granted in part and denied in part**,

and the Motion to Dismiss filed by Defendants Tress Boles, Curtis Back, Jim Lilly, Scott Cannon,

---

[10] In addition to a substantive due process claim under the Fourteenth Amendment, it appears that plaintiffs have also asserted separate claims arising under the Fourth and Fifth Amendments.  The parties have not presented any argument related to these claims.

John Whetsel, and Larry Grant [Document No. 31] is **granted in part and denied in part**.

**IT IS SO ORDERED** this 28th day of August 2008.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

37